# ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| PILOT CORPORATION OF AMERICA,<br><br>                          Plaintiff,<br><br>      - against -<br><br>FISHER-PRICE, INC. and MATTEL, INC.,<br><br>                     Defendants. | Index No.: _____<br><br>**COMPLAINT**<br><br><br>June 15, 2004<br><br>**Jury Trial Demanded** |

Plaintiff, Pilot Corporation of America ("PCA"), by its attorneys, Grimes & Battersby, LLP, for its complaint against defendants Fisher-Price, Inc. ("Fisher-Price") and Mattel, Inc. ("Mattel") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1. This action arises out of Defendants' blatant and willful violation of PCA's trademark and trade dress rights in the popular MAGNA DOODLE writing and drawing toy, in violation of the Lanham Act and state law.

2. The MAGNA DOODLE drawing toy is a highly successful and enduring product, with approximately 68 million units sold since 1978. PCA owns (1) an incontestable federal trademark registration for the MAGNA DOODLE mark; (2) the trade dress rights associated with the distinctive look and feel of the product configuration and packaging; and (3) proprietary rights related to the magnetic drawing board (referred to herein as the "panel") incorporated into the product.

3. From 1987 to 2003, Defendants and their predecessors used PCA's valuable

1

intellectual property rights under license from PCA to manufacture, market and sell a line of licensed MAGNA DOODLE products in the U.S. and worldwide.   In September 2003, Defendants sought to renegotiate the parties' license agreement – in essence seeking to get a better deal for themselves by demanding that PCA slash the amount of revenue it receives under the parties' agreement by 60% as a condition for continuing the license. When PCA refused Defendants' unreasonable demand, Defendants terminated the agreement effective December 31, 2003.

4.   Following termination, Defendants have shamelessly and intentionally traded upon the good will embodied in PCA's valuable trademark, trade dress and other proprietary rights by selling the same toy that they had previously sold under license from PCA using a confusingly similar trademark, DOODLE PRO, and the *identical* product configuration and virtually identical packaging trade dress.  In so doing, Defendants have unlawfully appropriated PCA's valuable intellectual property without its consent in a blatant attempt to pass off Defendants' DOODLE PRO product as a MAGNA DOODLE drawing toy.  As recently as late May, the MAGNA DOODLE and DOODLE PRO products appeared on the same retail store shelves. Defendants' DOODLE PRO product also appeared at retail on shelves that were labeled with the MAGNA DOODLE mark and displayed MAGNA DOODLE point of sale material.  In addition, PCA's licensed MAGNA DOODLE product is set to re-enter the market later this year with a different manufacturer/licensee, and there is a real threat that Defendants' product will swamp MAGNA DOODLE because of Defendants' dominant position in the toy industry.   PCA has already been informed that there is virtually no available retail shelf space for the upcoming 2004 holiday selling period because of the existence of Defendants' infringing product.  Accordingly, the harm suffered by PCA as a result of Defendants' infringement and

2

unfair competition is irreparable, and Defendants' wrongful activities will continue unless enjoined by the Court.

PARTIES

5.      PCA is a corporation organized and existing under the laws of the State of Delaware, having an address and principal place of business at 60 Commerce Drive, Trumbull, Connecticut 06611.   PCA is a subsidiary of Pilot Corporation of Japan ("Pilot Corp."), the oldest and largest manufacturer of writing instruments in Japan.   PCA's principal business involves the manufacture, distribution and sale of popular writing instruments in the United States, but it also derives significant income from the licensing of its valuable MAGNA DOODLE trademark and associated intellectual property rights.

6.      Upon information and belief, Fisher-Price is a corporation organized and existing under the laws of the State of Delaware, having an address and principal place of business at 636 Girard Avenue, East Aurora, New York, 14052.   Upon information and belief, Fisher-Price, an affiliate of Mattel since 1993, is the maker of the accused DOODLE PRO product, which is being distributed and sold throughout the United States, including in Connecticut.

7.      Upon information and belief, Mattel is a corporation organized and existing under the laws of the State of Delaware, having an address and principal place of business at 333 Continental Boulevard, El Segundo, California, 90245.   Upon information and belief, Mattel, the world's largest toy company, claims to own the rights to the DOODLE PRO trademark and has directed the activities of Fisher-Price at all relevant times herein.

JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338 and 15 U.S.C. § 1121 because Pilot's claims arise under the

3

Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051, *et seq*.  The Court has supplemental

jurisdiction over the state law claims under 28 U.S.C. § 1338(b) and 28 U.S.C. § 1367(a).

9.     This Court has personal jurisdiction over Defendants pursuant to Connecticut

General Statutes § 33-929 by virtue of the fact that, upon information and belief, Defendants:

(1) regularly conduct continuous, systematic and routine business within the State of

Connecticut; and (2) have committed tortious acts within this state, namely engaging in the acts

of trademark infringement and unfair competition as complained of herein.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

FACTS COMMON TO THE COUNTS

I.     PCA's Valuable Intellectual Property

A.     The Origin of Pilot Corp's Proprietary Panel Technology

11.     In 1974, four engineers employed by Pilot Corp. invented a new device, known

as a "Magneto Phoretic Display Board," for use as a dustless presentation board to be placed in

"clean" rooms that housed computers.  A Japanese toy company became aware of Pilot Corp.'s

invention and suggested that the technology could be used in connection with a children's

creative toy.  Thereafter, Pilot Corp. refined the original large display board prototype and

created a smaller panel for use in connection with a licensed children's writing and drawing toy

that was marketed and sold in Japan under the trademark SENSEI (Japanese for "teacher").

12.     The panel technology works as follows: children write or draw on the panel as

they would on a piece of paper by placing a plastic stylus (in the shape of a pen) with a

magnetic tip directly on the panel; when the stylus touches the screen, magnetic iron filings that

are held in a dispersion liquid come to the surface and form an image; the screen is then cleared

using a magnetic eraser bar that pulls the filings away from the surface.

B.    The Origin of the MAGNA DOODLE Brand in the U.S.

13.    In 1978, Pilot Corp. licensed its proprietary magnetic panel technology to Mego Corporation ("Mego Corp.") for use in connection with the manufacture, distribution and sale of licensed drawing toys in the U.S.  Upon information and belief, Mego Corp. first introduced a product bearing the trademark MAGNA DOODLE in the U.S. that same year.

14.    The original MAGNA DOODLE product was configured as follows: the 10 ½ x 8" panel was housed left of center in a rectangular-shaped blue frame (akin to a picture within a frame) with rounded corners; a plastic stylus and two shape stampers, orange in color, were located on the right side, housed within the recesses of the upper surface; and an eraser bar, also orange in color, was horizontally disposed at the base of the frame. It is important to note that the configuration of the original full-size MAGNA DOODLE product remained the same for approximately 20 years, until the late 1990s, when the look and feel was modified subject to the review and approval of PCA.  A stylized version of the MAGNA DOODLE trademark was displayed prominently on the product itself.  The MAGNA DOODLE trademark was also featured prominently on the front cover of the box in an oversized typeface.  A photograph depicting the actual licensed MAGNA DOODLE product appeared below the MAGNA DOODLE trademark on the cover. (Photographs depicting the original MAGNA DOODLE licensed product and packaging from 1978 are attached hereto at Tab A).

15.    On March 13, 1979, the U.S. Patent and Trademark Office issued U.S. Patent No. 4,143,472 (the "'472 Patent"), entitled "Displaying Magnetic Panel and its Display Device," to Pilot Corp.  The claims disclosed in the '472 Patent related to the utility of Pilot Corp.'s panel technology.   In 1980, Pilot Corp. and Mego Corp. entered into a new license agreement to reflect the issuance of the '472 Patent to Pilot Corp.

5

16.     On November 6, 1986, View-Master Ideal Group, Inc. ("View-Master"), acquired all right, title and interest in and to the MAGNA DOODLE trademark, the products and the business goodwill associated therewith, from Mego Corp., its former exclusive licensee, CBS, Inc., and its creditor, General Electric Credit Corp.

17.     On December 23, 1986, Pilot Corp. granted an exclusive license to PCA under the '472 Patent to manufacture, distribute and sell drawing toys in the United States that incorporated Pilot Corp.'s patented panel technology.

18.     On January 1, 1987, PCA acquired from View-Master all right, title and interest in and to the MAGNA DOODLE trademark and the goodwill associated with the business and products. Under the same written agreement, PCA granted to View-Master the exclusive right to manufacture and sell drawing toys under the MAGNA DOODLE trademark. Tyco Toys, Inc. ("Tyco"), a toy company, acquired View-Master in 1988. Upon information and belief, Tyco assumed all of View-Master's rights and obligations under the January 1, 1987 license agreement between PCA and View-Master.

19.     By 1991, annual sales of the MAGNA DOODLE product were 4.5 million units. During this time period, the product configuration and packaging trade dress were identical to the 1978 version of MAGNA DOODLE. (Photographs depicting the MAGNA DOODLE licensed product and packaging from 1988 are attached hereto at Tab B).

C.     PCA's 1992 License Agreement with Defendants' Predecessor, Tyco Toys

20.     On January 1, 1992, PCA entered into a new license agreement with Tyco (the "1992 Agreement"). (A true and complete copy of the 1992 Agreement is attached hereto at Tab C). Pursuant to paragraphs 2.1 and 2.2 of the 1992 Agreement, PCA licensed Tyco the exclusive right to use the MAGNA DOODLE trademark in connection with the manufacture and sale of licensed drawing toys incorporating the technology covered by Pilot Corp's '472 Patent in the United States and in other countries throughout the world. (*Id*.).

21.     Pursuant to paragraph 2.3 of the 1992 Agreement, PCA also granted Tyco a sub-license to use confidential information in connection with the manufacture of licensed MAGNA DOODLE products, which consisted of the proprietary information and know-how related to the methods for manufacturing the panels and MAGNA DOODLE products. (*Id*.) Tyco agreed that it would not use the confidential information disclosed by PCA following termination of the 1992 Agreement. (*Id*. ¶ 16.4).

22.     Pursuant to paragraph 3.1 of the 1992 Agreement, Tyco acknowledged that PCA owned all right, title and interest in and to the MAGNA DOODLE trademark, that Tyco would not acquire any rights in the mark by virtue of its status as a licensee and that *all* use of the MAGNA DOODLE mark inured to PCA's benefit. (*Id*. ¶ 3.1).

23.     Unlike traditional license agreements where the licensor is remunerated by receiving a fixed percentage of the licensee's sales of licensed product (known as a "royalty"), the 1992 Agreement instead obligated Tyco to purchase from PCA 100% of its annual requirements of panels for incorporation into the MAGNA DOODLE licensed product line. (*Id*. ¶ 4.1). The parties agreed to negotiate the quantity of shipment and the price of the panels by October 15 of each calendar year. (*Id*.)

7

24.     On March 30, 1994, the parties amended the 1992 Agreement to expand the prior definition of "Mark" to also include "any trademarks which may subsequently be used in connection with the marketing and sale of goods in the "MAGNA DOODLE" line pursuant to license from PCA . . . ." (A true and complete copy of the March 30, 1994 amendment is attached hereto at Tab D).

25.     From 1994 to 1996, annual sales of MAGNA DOODLE products were in excess of three million units.  During this time period, Tyco sold three different sizes of MAGNA DOODLE licensed products – the original full-size version and smaller travel and pocket sized versions – along with several different accessories, such as stencils featuring famous character names and likenesses, including *Little Mermaid, Snow White, Lion King* and *Spiderman.*  The configuration of the full-size MAGNA DOODLE product at that time was identical to the configuration of the original 1978 MAGNA DOODLE product.  The packaging for the full-size product consisted of a box with a clear plastic front cover, allowing the purchaser to view the MAGNA DOODLE product.  The MAGNA DOODLE trademark was featured prominently on the front cover of the box in an oversized typeface. (Photographs depicting the MAGNA DOODLE licensed product and packaging from 1993 are attached hereto at Tab E).

26.     In 1993, Tyco sold several different variations of the pocket sized MAGNA DOODLE product, including, in particular, the MAGNA DOODLE DAN doll/drawing toy.  On the front cover of the MAGNA DOODLE DAN package, the "MAGNA" portion of PCA's trademark appears in a very small print, while the "DOODLE" portion is emphasized in a much larger typeface. (A photograph depicting the MAGNA DOODLE DAN packaging from 1993 is attached hereto at Tab F).

27.     On February 3, 1997, PCA and Tyco amended the 1992 Agreement to expand the prior definition of "Panel" to also include U.S. Patent No. 5,151,032, an improvement of the '472 Patent entitled "Magnetophoretic Display Panel," issued to Pilot Corp. on September 29, 1992. (A true and complete copy of the February 3, 1997 amendment is attached hereto at Tab G ).

　　　　　D.     Defendants' Manufacture, Marketing and Sale of Licensed
　　　　　　　　MAGNA DOODLE Products

28.     Upon information and belief, Defendant Mattel merged with Tyco in 1997. Upon information and belief, Fisher-Price, Mattel's pre-school subsidiary, assumed all of Tyco's rights and obligations under the 1992 Agreement that same year.

29.     In 1998, the design of the full-size MAGNA DOODLE licensed product was modified with PCA's review and approval, as required by the 1992 Agreement.  Specifically, with respect to the product's configuration: a handle was added at the top of the product; the number of shape stampers was increased from two to six, in several different colors and shapes; the sides of the product were now white in color; the four corners of the product became more rounded, simulating the shape of the round stamper; and the panel was now centered in the frame.  The MAGNA DOODLE trademark continued to appear prominently on the top-center of the product.  Despite these changes, the look and feel of the MAGNA DOODLE product remained close to the original version that had been marketed and sold for 20 years.  With respect to the packaging, Fisher-Price switched from a clear plastic cover to a cardboard box. The cover of the box depicted a photograph of a child playing with the MAGNA DOODLE product, along with a display of the product itself.  The MAGNA DOODLE trademark is displayed prominently on the cover of the box in an oversized typeface, in the color purple

against a yellow background. (Photographs depicting the MAGNA DOODLE licensed product and packaging from 1998 are attached hereto at Tab H).

30. The MAGNA DOODLE line was again modified in 2003 with PCA's review and approval, as required by the 1992 Agreement. The configuration of the full-size product changed as follows: a drawer was added on the left side to house the shape stampers, which were reduced in number from six to four; the color of the handle and the four corners were changed to grey; the panel was enclosed in a separate frame, green in color; and the right side and bottom of the frame were concave in shape. The MAGNA DOODLE mark was displayed on the green frame on the top-center of the product. The packaging returned to a clear plastic cover, allowing purchasers to view the product. The MAGNA DOODLE trademark was featured prominently on the cover and on the sides of the package. (Photographs depicting the MAGNA DOODLE licensed product and packaging from 2003 are attached hereto at Tab I).

31. From 2001 to 2003, Fisher-Price sold in the range of between 3.8 and 5 million licensed MAGNA DOODLE products annually, resulting in annual sales revenue in excess of $40 million. During this time period, Fisher-Price sold several different sizes of the MAGNA DOODLE licensed product – including the original full-sized version, a smaller travel version and a pocket-size clip-on version. In addition, Fisher-Price also introduced several extensions of the MAGNA DOODLE licensed product line, including, but not limited to, electronic products such as the DOODLE TALKER and a new version of the MAGNA DOODLE LEARNING BUS, products that incorporated other character names, such as BLUES CLUES HANDY DANDY NOTEBOOK MAGNA DOODLE, and other learning products, such as MAGNA DOODLE ALPHA PAD. (A copy of the 2003 MAGNA DOODLE product line is attached hereto at Tab J). Pursuant to the 1992 Agreement, as amended, PCA owns all of the

common law trademark rights to the variations of the MAGNA DOODLE mark used in commerce – including the other marks such as EXPRESSIONS and LEARNING BUS – and all use of these marks, and any variations thereof, inured to PCA's benefit, not Fisher-Price's. (See Tab C ¶ 3.1; Tab G).

      E.      Ownership and Marketplace Recognition of PCA's
              MAGNA DOODLE Trademark and Trade Dress

32.      PCA is the owner of U.S. Trademark Registration No. 1,437,414 for the trademark MAGNA DOODLE for "drawing toy" in Int'l Class 28 on the Principal Register. (A copy of PCA's trademark registration certificate is attached hereto at Tab K). Said registration issued in 1987 and has become incontestable. As an incontestable mark, MAGNA DOODLE is presumed to be distinctive and to have acquired secondary meaning. Irrespective of such presumption, there is no question that the mark MAGNA DOODLE has acquired strong secondary meaning in the minds of the consuming public, as set forth below.

33.      Pursuant to the 1987 View-Master-PCA agreement, the 1992 Agreement, as amended, industry custom and practice and generally-accepted principles of trademark law, PCA owns the trade dress rights associated with all of the MAGNA DOODLE licensed products sold under license from PCA. The configuration trade dress, which has evolved since 1978, encompasses the design and appearance of the MAGNA DOODLE products together with all non-functional elements that comprise the overall image that serves to identify the product presented to the consumer. Specifically, the product design trade dress consists of a drawing product having a center panel surrounded by a frame, and:

           (a) the shape, style, composition, color, location and finish of the frame;

           (b) the shape, style, composition, color, location and finish of the stylus;

           (c) the shape, style, composition, color, location and finish of the shape stampers;

(d) the shape, style, composition, color, location and finish of the eraser bar;

(e) the shape, style, composition, color and location of the panel; and

(f) the style, color and location of the depiction of PCA's MAGNA DOODLE trademark.

34.    Similarly, the packaging trade dress, which has evolved since 1978, encompasses the design and appearance of the packaging together with all non-functional elements that comprise the overall image that serves to identify the product presented to the consumer.  With respect to the MAGNA DOODLE products, the trade dress consists of:

(a)  the style, color and location of PCA's MAGNA DOODLE trademark;

(b)  the style, color and location of the depictions of the MAGNA DOODLE product on the cover of the package; and,

(c)  the content and location of photographs depicting children using the MAGNA DOODLE product on the cover.

35.    The MAGNA DOODLE product ranks among the top selling toys over the past twenty-five years.  Approximately 68 million MAGNA DOODLE products have been sold since 1978. The MAGNA DOODLE product has consistently ranked at or near the top of its product category in terms of U.S. sales since the early 1990s. In 2000, the MAGNA DOODLE product was ranked fourteenth in terms of overall unit sales and sixteenth in terms of overall dollar sales among all U.S. toys (*i.e.*, including other popular toy products such as HOT WHEELS and BARBIE), and it had a 60% share of the mechanical design segment of the toy industry.  In 2002, the MAGNA DOODLE product ranked as the number one selling toy in the arts and crafts category.  The MAGNA DOODLE product has been offered for sale at retail

12

wherever toys are sold, including at major retail chains such as Wal-Mart, Toys R' Us, Target, K-Mart and Kaybee Toys, and by major Internet retailers such as Amazon.com/Toys R' Us.

36.     The public recognition of the MAGNA DOODLE trademark and trade dress has been enhanced over the years through efforts to market, advertise and promote the products. The MAGNA DOODLE trademark and product have been featured in television commercials, in print media and in point of sale material.  Fisher-Price also featured MAGNA DOODLE products on its Internet web site.  Upon information and belief, Fisher-Price spent $5 million on marketing and advertising the MAGNA DOODLE brand from 2001 to 2003, in accordance with its express obligation under paragraph 10.3 of the 1992 Agreement.

37.     The MAGNA DOODLE mark has gained exposure through other means as well. MAGNA DOODLE products have been repeatedly featured on the popular television series, *Friends*. At least one professional football team has used the MAGNA DOODLE product on the sidelines to diagram plays.  MAGNA DOODLE products have also received numerous awards, including the National Parenting Center 2003 Seal of Approval and the Oppenheim Toy Portfolio Gold Seal Award for 2003.

38.     The distinctiveness and strength of the MAGNA DOODLE mark has not been diluted by third-party use.  PCA is not aware that any third-party is presently using the term DOODLE as a trademark in connection with any product in the same market segment as MAGNA DOODLE.  Through the years PCA has been vigilant in challenging efforts by third-parties to use the mark "DOODLE" in connection with activity toys.  Since 1990 PCA has challenged at least four different instances of unauthorized third-party use of the DOODLE portion of its MAGNA DOODLE trademark with success.  On at least two occasions, Defendants urged PCA to pursue enforcement against unauthorized use of the DOODLE mark

in connection with drawing toys.  In 1998, an entity named Up, Up & Away withdrew its WONDER DOODLE product from the market after a challenge by PCA, and in 2002, PCA successfully prevented a U.K. company from using the mark MAGIC DOODLE BOARD in connection with an activity toy.

39.    PCA's MAGNA DOODLE trademark and trade dress are widely recognized by the trade and the public and have built up extensive goodwill.  Since 1978, the MAGNA DOODLE trademark and trade dress have been used in connection with a drawing toy of the highest quality.

40.    PCA's MAGNA DOODLE trademark is inherently distinctive to the public and the trade with respect to a drawing toy and, upon information and belief, in the United States, the MAGNA DOODLE trademark serves primarily as a designator of origin of products emanating from or sponsored or licensed by PCA.

41.    As a result of the widespread use and display of PCA's MAGNA DOODLE trademark and associated trade dress, (a) the public and the trade use the MAGNA DOODLE trademark and trade dress to identify and refer to the licensed MAGNA DOODLE products; (b) drawing toys marked with the MAGNA DOODLE trademark and trade dress are recognized by the trade and the public as high quality toys emanating from a single source of origin; and (c) said trademarks and trade dress have built up secondary meaning and extensive goodwill.

II.   DEFENDANTS' INFRINGEMENT AND UNFAIR COMPETITION

    A.    Defendants' Unreasonable Demand That PCA Significantly
          Reduce its Income from Panel Sales

42.    Pursuant to the 1992 Agreement, Fisher-Price was required to and did in fact purchase all of its requirements of panels for the MAGNA DOODLE licensed product line from PCA from 1997 to 2003.  The panels were manufactured for PCA by Pilot Corp. in Japan.  (In

fact, Pilot Corp. and its sub-licensees have supplied all of the panels used in connection with the MAGNA DOODLE product since its inception in 1978).

43.     When Fisher-Price first became PCA's licensee in 1997, it complained to PCA about what it perceived to be the high price of the licensed panels. Fisher-Price claimed that it faced increased competition from third-parties, and Fisher-Price urged PCA to lower the price of its panels so that Fisher-Price could in turn lower the price of the products. Fisher-Price warned that sales of the MAGNA DOODLE product line would decline absent a price reduction by PCA. Fisher-Price continued to raise the same issue with PCA periodically from 1997 to 2003.

44.     Despite Fisher-Price's dire predictions about declining market share, sales of MAGNA DOODLE continued to increase, rather than decrease, over the years and Fisher-Price continued to turn a hefty profit. Upon information and belief, Fisher-Price's profit margin on sales of MAGNA DOODLE product was believed to be approximately 36%. Nevertheless, in order to accommodate its licensee and in the spirit of cooperation, PCA ultimately lowered the price of the panels on two separate occasions between 2000 and 2002 as part of an ongoing cost reduction program. PCA invested $2 million for new equipment that was specifically designed to reduce the cost of manufacturing the panels. As a result of PCA's significant investment, PCA was able to reduce the price per panel by $ .33 (a 10% reduction). PCA soon learned that Fisher-Price never passed the savings on to retailers – instead it kept the money for itself.

45.     Against this backdrop, it came as no surprise to PCA that, on or about September 12, 2003, Fisher-Price once again requested that PCA lower the price of the panels. But this time, Fisher-Price did not merely request a reduction in price, it *demanded* that PCA lower the price by 60% or Fisher-Price would terminate the agreement effective December 31, 2003.

15

Fisher-Price urged PCA to source the panels from China, instead of from PCA Corp. in Japan, in order to get better pricing. Fisher-Price set a deadline of October 15, 2003 for PCA to render its decision. (*See* Letter from Peter Snajczuk to Ron Shaw, dated October 6, 2003, attached hereto at Tab L).

46.     Despite PCA's initial belief that a 60% reduction in price was patently unreasonable, PCA nevertheless gave serious consideration to Fisher-Price's demand because of the importance of the Fisher-Price license to PCA.  Ultimately, PCA rejected Fisher-Price's demand out of considerations of cost and out of a concern that moving the manufacturing facilities to China would raise enormous practical concerns about quality control and the ability to meet future shipping deadlines. (*See* Letter from Thomas J. Restivo to Peter Snajczuk, dated October 13, 2003, attached hereto at Tab M).

47.     On October 17, 2003, PCA's legal counsel sent a letter to Fisher-Price outlining certain of Fisher-Price's obligations under the 1992 Agreement in anticipation that Fisher-Price would terminate the agreement effective December 31, 2003.  (*See* Letter from Stephen D. Kahn, Esq. to Peter Snajczuk, dated October 17, 2003, attached hereto at Tab N).

48.     On or about October 17, 2003, PCA received orders from Fisher-Price for certain additional shipments of panels.  PCA accepted these orders under the express understanding that the shipment of panels would be governed by the termination clause of the 1992 Agreement and would only be incorporated into MAGNA DOODLE products, in accordance with the 1992 Agreement. (*See* E-mails from Tony Craig to Erwin Hetzelt, dated October 21 and 29, 2003, attached hereto at Tab O).  Pursuant to Section 17.1 of the 1992 Agreement, Fisher-Price had the right to exhaust existing inventory of MAGNA DOODLE product for a 180-day period commencing on January 1, 2004. (*See* Tab C ¶ 17.1).

49.     Because Fisher-Price failed to place its annual order for panels with PCA prior to October 15, 2003, the 1992 Agreement automatically terminated effective December 31, 2003. The termination of the 1992 Agreement resulted in a net loss of at least 45 jobs at Pilot Corp.'s manufacturing facility.

B.     Defendants' Infringement and Unfair Competition Following
       Termination of the Agreement

1.     PCA's Discovery of Defendants' Infringement

50.     On February 10, 2004, Tony Craig, PCA's Manager of New Business Development, learned from an executive at another toy company that Fisher-Price was marketing and promoting a replacement for the MAGNA DOODLE toy line using the trademark DOODLE PRO.  Thereafter, PCA learned that not only had Fisher-Price adopted a trademark that was confusingly similar to its own MAGNA DOODLE mark, but that Fisher-Price was selling the product in the exact same configuration and packaging as MAGNA DOODLE.  (Photographs depicting the configuration and packaging for the DOODLE PRO product are attached hereto at Tab P).

51.     On March 5, 2004, PCA learned for the first time that Defendants were using PCA's panels in connection with the DOODLE PRO product.  A memo from Erwin Hetzelt, purportedly in response to Tony Craig's e-mail messages from October 2003, stated that "in view of the limited sell-off rights, a decision was made to transition from the Magna Doodle Branded writing toy to a Fisher-Price Branded product.  The remaining screens which Pilot sold and shipped to Mattel and its designated vendors will be incorporated into the Fisher-Price Branded product until the screen inventory is depleted.  All future correspondence or inquiries should be sent to our General Counsel, Dennis Wesolowski."  (*See* Memo from Erwin F. Hetzelt, III to Tony Craig, dated March 5, 2004, attached hereto at Tab Q).  Upon information

17

and belief, Defendants' use of the patented and proprietary panels supplied by PCA/Pilot Corp. in DOODLE PRO is a material breach of the 1992 Agreement.

52.     In April 2004, PCA reached an agreement in principle with The Ohio Art Company ("Ohio Art") to manufacture and market MAGNA DOODLE products in the U.S. and in other countries. (*See* Press Release, dated April 13, 2004, attached hereto at Tab R). The parties' memorialized the license in a written agreement, dated May 5, 2004.

2.     Defendants' Infringing Product

53.     On May 3, 2004, Mattel filed U.S. Trademark Application Serial No. 78/412,092, seeking to register the mark DOODLE PRO for "toys, games and playthings" in Class 28. (A copy of Mattel's electronically-filed application is attached hereto at Tab S).

54.     An investigation of the retail marketplace has revealed that Fisher-Price's DOODLE PRO product has appeared at times directly adjacent to the MAGNA DOODLE brand drawing toy on the same retail store shelves. (Photographs depicting retail placement are attached hereto at Tab T). In addition, in many retail stores the DOODLE PRO product is being sold on store shelves that still display stickers and/or signage for MAGNA DOODLE. (Photographs depicting retail placement are attached hereto at Tab U). The situation with respect to Internet retailers is even more serious. When visitors to Amazon.com, the Internet's largest toy retailer, enter "MAGNA DOODLE" in the search bar, they are immediately directed to a page featuring DOODLE PRO. (Printouts from Amazon.com are attached hereto at Tab V). The same result occurs on other web sites, including Fisher-Price's own site. (Printouts from various web sites are attached hereto at Tab W).

55.     Upon information and belief, Defendants continue in their course of infringing conduct with full knowledge that PCA owns the U.S. trademark rights to the MAGNA DOODLE

18

registered trademark and associated trade dress, and that PCA has not authorized use of said trademark or trade dress in connection with an unlicensed drawing toy.

56.     Upon information and belief, Defendants' termination of the 1992 Agreement and subsequent sale of an infringing product was part of a calculated effort to eliminate PCA's MAGNA DOODLE product from the marketplace, while gaining a cheaper source of panels from China so that Defendants could market and sell their own lower-cost product using a confusingly similar mark and identical trade dress.   Thus, Defendants have willfully and intentionally violated PCA's trademark and trade dress rights with the deliberate intention of trading on the valuable goodwill and reputation established in the MAGNA DOODLE trademark and trade dress by deceiving the public into believing that their product is in fact a MAGNA DOODLE drawing toy, or is in some way associated therewith.

57.     Upon information and belief, Defendants' DOODLE PRO product incorporates panels supplied by PCA/Pilot Corp. that are covered by the '032 Patent.   Upon information and belief, Defendants' have failed to place the notice provision required by paragraph 10.2 of the 1992 Agreement on the DOODLE PRO package.   This constitutes a material breach of the 1992 Agreement.

### 3.     PCA's Consumer Confusion Survey

58.     PCA commissioned a consumer confusion survey to measure the likelihood of confusion among ordinary consumers, if any, between the marks MAGNA DOODLE and DOODLE PRO when used in connection with a drawing/writing toy.   PCA retained Admar Group, Inc. ("Admar") to conduct the survey.   Admar's survey conformed to generally accepted standards of professional market research and included quality-control procedures exceeding those of normal commercial research.   Admar conducted the survey in late May 2004.   Men and

women over the age of 21 were intercepted in the public areas of ten different geographically-dispersed shopping malls to locate individuals who stated an intention to purchase "a toy which allows for writing and drawing on an erasable board" for a child 3 to 8 years of age during the next six months. The survey sample included 232 individuals, roughly equally divided between men and women. The actual interviews were conducted in a research office, where respondents were shown two portfolios, each containing a test (one of the parties' marks), a control and other toy products to minimize bias and to best simulate marketplace purchasing conditions. Respondents were then asked a series of questions to probe the likelihood of confusion between the parties' marks, if any. The results of the survey are striking: 31% of the respondents perceived a relationship between the MAGNA DOODLE and DOODLE PRO marks, either because they were the same brand, were made by the same company or that DOODLE PRO had obtained approval or permission from the company that made the MAGNA DOODLE product. The 31% confusion rate is strong evidence that consumers are likely to be confused by the parties' marks as used in commerce.

III.   IRREPARABLE HARM

59.   Ohio Art hopes to introduce a new MAGNA DOODLE licensed product line sometime this fall in order to gain market entry prior to the all-important holiday selling season, during which time an estimated 70% of annual sales of toy products are made. Ohio Art has learned, however, that there is virtually no available retail shelf space for the upcoming 2004 holiday selling period because of the existence of Defendants' infringing product. Hence, Defendants' continued sale of an infringing product is not only depriving PCA of revenue from actual sales of the product, it has raised the distinct possibility that PCA's licensed MAGNA DOODLE product will be precluded from market entry for the entire 2004 holiday selling

season, a scenario which is likely to have devastating long-term consequences for the MAGNA DOODLE brand.

60.     Even if Ohio Art succeeds in gaining retail shelf space, it is likely that the MAGNA DOODLE product will be sold in the same sections and perhaps even on the same shelves as Defendants' DOODLE PRO product.  Moreover, the parties' products are certain to appear in close proximity on Internet e-commerce web sites. The confusing similarity of the parties' marks and the identity of the configuration and packaging for the goods leads to two likely results:

(a)     The sale of Fisher-Price's DOODLE PRO product is likely to cause confusion, mistake and/or deception as to the source of origin of Defendants' products in that the public, the trade and others are likely to believe that Defendants' products are PCA's MAGNA DOODLE products; and/or that the parties' products are provided by, sponsored by, approved by and/or licensed by the same source; and/or are provided by, sponsored by, approved by, licensed by, affiliated with or in some other way legitimately connected to PCA or MAGNA DOODLE.

(b)     In the alternative, the sale of Fisher-Price's DOODLE PRO product, as aforesaid, is likely to cause reverse consumer confusion.  Defendants collectively have a large share of the U.S. toy market, have the potential to expend limitless sums on marketing and advertising and wield enormous power with major retailers.  Because of Defendants' dominant position in the toy industry relative to Ohio Art, it is likely that Defendants' product will swamp the reputation of the MAGNA DOODLE drawing toy and overwhelm the product in the marketplace.  The result will be that PCA will lose the value of its trademark and trade dress, its product identity, control over its goodwill and reputation and ability to move into new markets. Consumers may even perceive Ohio Art's licensed MAGNA DOODLE product to be an

unauthorized infringement of Defendants' product, which would seriously impair the goodwill associated with the MAGNA DOODLE mark.

61.    Moreover, Defendants' continued sales of unauthorized, infringing products is depriving PCA of the ability to control the use of its valuable intellectual property.  To this end, upon information and belief, the Chinese panels that Fisher-Price will incorporate into DOODLE PRO products after June 30, 2004 will be of a much lower quality than the Japanese panels that have been incorporated into MAGNA DOODLE products for the past twenty-five years.  As such, it is likely that the MAGNA DOODLE brand will be tarnished by the public's association of the brand with the lower-quality DOODLE PRO product.

62.    Upon information and belief, unless restrained by this Court, Defendants will continue to willfully and intentionally manufacture, market and distribute products which infringe PCA's registered trademark and which pass off PCA's configuration and packaging trade dress, causing irreparable harm to PCA.  PCA has no adequate remedy at law.

First Cause of Action

TRADEMARK INFRINGEMENT

63.    PCA repeats and re-alleges each and every allegation of paragraphs 1 through 62 as though fully set forth herein.

64.    Defendant's aforementioned acts constitute willful infringement of PCA's federally registered trademark for MAGNA DOODLE, in violation of the Lanham Act, 15 U.S.C. § 1114, *et. seq.*, and the common law.

65.    As a direct and proximate result of the foregoing acts of Defendants, PCA has been damaged and has suffered and will continue to suffer immediate and irreparable harm. Unless restrained by the Court, Defendants will continue to cause irreparable injury and damage

to PCA and to the goodwill associated with PCA's MAGNA DOODLE mark.  Plaintiff is without an adequate remedy at law.

Second Cause of Action

LANHAM ACT SECTION 43(a)

66.    PCA repeats and re-alleges each and every allegation of paragraphs 1 through 65 as though fully set forth herein.

67.    Through its unauthorized use of trade dress that is virtually identical to the trade dress owned by PCA, which has been used in connection with the configuration and packaging of the MAGNA DOODLE product for more than 25 years, Defendants are knowingly and intentionally misrepresenting, falsely designating and passing off to the general public the nature, origin, and source of the DOODLE PRO product, and intend to misrepresent, falsely designate and pass off to the general public the nature, origin and source of the goods, so as to create a likelihood of confusion by the public as to the nature, source and sponsorship of the goods.

68.    Defendants' aforementioned acts constitute false designation of origin, passing off and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), *et. seq.*

69.    As a direct and proximate result of the foregoing acts of Defendants, PCA has been damaged and has suffered and will continue to suffer immediate and irreparable harm. Unless restrained by the Court, Defendants will continue to cause irreparable injury and damage to PCA and to the goodwill associated with PCA's MAGNA DOODLE mark.  Plaintiff is without an adequate remedy at law.

23

Third Cause of Action

UNFAIR TRADE PRACTICES

70.     PCA repeats and re-alleges each and every allegation of paragraphs 1 through 69 as though fully set forth herein.

71.     Defendants have engaged in actual deceptive practices and/or have committed acts amounting to a violation of public policy with respect to their efforts to pass off the DOODLE PRO product as the MAGNA DOODLE product.

72.     In addition, upon information and belief, Defendants have used in the manufacture of DOODLE PRO products Confidential Information licensed to them under the 1992 Agreement, which constitutes a misappropriation of trade secrets under the Connecticut Unfair Trade Practices Act. The Confidential Information includes, but is not limited to, the chemical composition of the panel and the relationship between the magnets and the screen.

73.     Defendants' aforementioned acts constitute unfair competition and unfair or deceptive acts or practices in violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§ 42-110a, *et seq*.

74.     PCA has been damaged by Defendants' aforementioned acts.

Fourth Cause of Action

COMMON LAW UNFAIR COMPETITION

75.     PCA repeats and re-alleges each and every allegation of paragraphs 1 through 74 as though fully set forth herein.

76.     Defendants' aforementioned acts constitute unfair competition under the common law.

77.     PCA has been damaged by Defendants' aforementioned acts.

24

Fifth Cause of Action

BREACH OF CONTRACT

78.    PCA repeats and re-alleges each and every allegation of paragraphs 1 through 77 as though fully set forth herein.

79.    The 1992 Agreement, as amended, reached between PCA and Defendants' predecessor, constitutes a binding agreement on Defendants.

80.    PCA performed all of its obligations under the agreement and has satisfied all conditions precedent in order to proceed with this claim.

81.    Defendants have materially breached the 1992 Agreement by, *inter alia*,

(a) Incorporating PCA's panels into the DOODLE PRO product, in violation of Sections I, II and XVII of the 1992 Agreement;

(b) Failing to mark and/or failing to properly mark the DOODLE PRO package, which contains PCA's patented and proprietary panels, with the notice provision required by paragraph 10.2 of the Agreement;

(c) Violating paragraph 8.2 of the 1992 Agreement, which prohibits Defendants from knowingly permitting "anyone under its control to willfully do any act or thing which would in any way impair the rights of PCA in and to the Mark or which would affect the validity of the Mark, or which would depreciate the value or reputation of the Mark;" and,

(d) Upon information and belief, violating paragraph 16.4 of the 1992 Agreement by using Confidential Information in connection with the manufacture of the DOODLE PRO product.

82.    As a result of Defendants' material breach of the 1992 Agreement, PCA has been

damaged in an amount as may be proven at trial.

Sixth Cause of Action

BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

83.     PCA repeats and re-alleges each and every allegation of paragraphs 1 through 82 as though fully set forth herein.

84.     The 1992 Agreement contained an implied covenant of good faith and fair dealing.  By reason of the intentional and wrongful conduct of Defendants described above, Defendants have breached the covenant of good faith and fair dealing, causing PCA substantial harm.

85.     By reason of the foregoing, PCA is entitled to recover from Defendants damages in an amount to be proven at trial.

PRAYER FOR RELIEF

WHEREFORE, PCA prays that the Court enter judgment:

A.     Granting a preliminary and permanent injunction restraining Defendants, their officers, directors, principals, agents, servants, employees, successors and assigns, and all individuals acting in concert or participation with them, from:

i)     registering or maintaining any federal or state trademark registration of any names, words, designations or symbols confusingly similar to the trademark MAGNA DOODLE, the secondary marks used in connection therewith, such as LEARNING BUS and EXPRESSIONS, and the configuration and packaging trade dress associated with the MAGNA DOODLE product (collectively, the "MAGNA DOODLE Trademarks"), including, but not limited to, the trademark DOODLE PRO;

ii) using any names, words, designation or symbols which are confusingly

26

similar to, or which colorably imitate, the MAGNA DOODLE Trademarks in connection with the sale of any good, or which are likely to cause confusion or mistake in the mind of the public or to deceive the public into the belief that Defendants' business and/or products are in any way associated with or related to PCA or its licensed goods, including, but not limited to, the trademark DOODLE PRO;

iii) otherwise infringing PCA's MAGNA DOODLE Trademarks, including, but not limited to, use of the MAGNA DOODLE mark as a metatag in connection with any Internet web site;

iv) engaging in false designation of origin, false description, false advertising or false representations or otherwise engaging in unfair competition, unfair business or deceptive trade practices or competing unfairly with PCA; and

v) engaging in any other conduct that is likely to cause confusion or to cause mistake or to deceive as to the source, affiliation, connection, or association of Defendants' products with PCA.

B.      Directing Defendants to withdraw with prejudice U.S. Trademark Application Serial No. 78/412,092, or, in the alternative, assigning all rights therein to PCA, including the goodwill associated therewith.

C.      Directing Defendants to use their best efforts to recall from the trade, including any and all distributors, wholesalers, dealers, retailers and all other third parties, any and all infringing products bearing the DOODLE PRO trademark and/or any and all products bearing any other mark that is confusingly similar to the MAGNA DOODLE Trademarks, along with all marketing, advertising, promotional and sales materials used in connection with the DOODLE PRO products and/or in the performance of Defendants' business.

D. Directing Defendants to file with the Court and serve on counsel for PCA, within thirty days after entry of any injunction issued by the Court in this action, a sworn statement as provided in 15 U.S.C. § 1116 setting forth in detail the manner and form in which the Defendants have complied with the injunction.

E. Directing Defendants to account for all gains, profits and advantages derived from the acts of infringement, false designation, passing off and unfair competition and for their other violations of law.

F. Directing that Defendants, jointly and severally, be ordered to pay to PCA all profits realized by Defendants by reason of the unlawful acts by Defendants as set forth in this Complaint, pursuant to 15 U.S.C. § 1117.

G. Directing that Defendants, jointly and severally, be ordered to pay to PCA all damages suffered by PCA by reason of the unlawful acts by Defendants as set forth in this Complaint, pursuant to 15 U.S.C. § 1117.

H. Directing that Defendants, jointly and severally, be ordered to pay treble damages to PCA on account of the defendant's willful, intentional and bad faith conduct pursuant to 15 U.S.C. § 1117;

I. Directing that Defendants, jointly and severally, be ordered to pay to PCA compensatory damages in an amount as may be proven at trial as a result of Defendants' material breach of the 1992 Agreement;

J. Directing that Defendants, jointly and severally, be ordered to pay to PCA punitive and exemplary damages as provided by law;

28

K.     Directing that Defendants, jointly and severally, be ordered to pay to PCA its reasonable attorneys' fees, costs and disbursements incurred herein in view of Defendants' intentional and willful infringement, pursuant to 15 U.S.C. § 1117;

L.     Awarding PCA pre-judgment and post-judgment interest to the maximum extent provided by law; and

M.     Awarding PCA such other and further relief as the Court may deem just and proper.

Dated: Norwalk, Connecticut
       June 15, 2004

Respectfully submitted,

GRIMES & BATTERSBY, LLP


By: _____
Gregory J. Battersby (Bar No. 07386)
Edmund J. Ferdinand, III (Bar No. 21287)
Richard E. MacLean (Bar No. 07323)
Russell D. Dize (Bar No. 23064)
Jessica Elliott (Bar No. 24871)
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008
(p) (203) 849-8300
(f) (203) 849-9300

Attorneys for the Plaintiff