# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PILOT CORPORATION OF AMERICA,
    Plaintiff,

v.

FISHER-PRICE, INC., ET AL.,
    Defendants.

CIVIL ACTION NO.
3:04cv977 (SRU)

## RULING and ORDER

In June 2004, the Pilot Corporation of America ("PCA") commenced this action, which principally involves claims of trademark and trade dress infringement, but also involves several related claims. On June 16, 2004, PCA filed a motion for preliminary injunction, seeking to enjoin Fisher-Price, Inc. and Mattel, Inc. (collectively "Fisher-Price") from selling a product that PCA believed infringed its federally registered trademark and its common-law trade dress rights. Because PCA did not show it was likely to succeed on the merits of its claim, I denied its motion for preliminary injunction on November 9, 2004.

Following completion of discovery, Fisher-Price filed a motion for summary judgment, seeking to wholly dismiss PCA's trademark and trade dress infringement and unfair competition claims, and in part, the Connecticut Unfair Trade Practices Act ("CUTPA") claim and breach of contract claim.[1] For the reasons that follow, the motion for summary judgment is granted.

## I. Factual Background

Although the factual background of this dispute was set forth in my ruling on PCA's motion for preliminary injunction, *Pilot Corp. of America v. Fisher-Price, Inc.*, 344 F. Supp. 2d 349 (D. Conn. 2004), I describe below the facts pertinent to the summary judgment motion.

---

[1] There are other claims that are not at issue in this motion.

A.    The Magna Doodle

 The Magna Doodle is a children's drawing toy that consists primarily of a drawing

screen made up of a lattice of small hexagons, each hexagon containing iron filings in

suspension.  The fluid in which the filings are suspended is opaque, and is viscous enough to

hold the filings in place against gravitational force, but not viscous enough to hold them in place

against magnetic force.  When the Magna Doodle's "stylus" – a plastic rod tipped with a magnet

– is drawn across the reticulated screen, the nearby filings are pulled to the top of the opaque

suspension and become visible on the screen.  The screen's lattice structure ensures an even

distribution of filings.  The Magna Doodle also has an  "eraser bar," which sweeps a magnetic

rod across the back of the screen, bringing all filings to the bottom of the suspended fluid,

effectively "cleaning" the board.

B.    The Agreement

PCA owns U.S. Patent No. 4,143,472 ("the '472 patent"), entitled "Displaying Magnetic

Panel and its Display Device," which covers the drawing screen used in the Magna Doodle.  PCA

also owns the federally registered trademark "Magna Doodle."

Since 1978, Magna Doodle products have been available on the market, though the mark

was not always owned by PCA, and the product itself has not always been manufactured by

Fisher-Price.  Details of those earlier licensing arrangements are not relevant.

On January 1, 1992, PCA entered into a licensing agreement ("the Agreement") with

Tyco, giving Tyco the exclusive right to use the "Magna Doodle" trademark in connection with

the manufacture and sale of drawing toys covered by the '472 patent.  In return, Tyco agreed to

purchase from PCA 100% of its annual requirement of panels for incorporation into its drawing

toys bearing the "Magna Doodle" mark. The Agreement required the parties to agree by October 15 of each year on the number and price of panels to be supplied. Failure to do so would result in the Agreement terminating at the end of the calendar year. If the Agreement terminated, Tyco was permitted to continue to sell its existing inventory of licensed products for 180 days after the termination date. The Agreement also provided that Tyco could use the "Magna Doodle" mark only in a manner approved by PCA.

In 1994 the parties amended the Agreement. The pertinent terms of the Agreement and the Amendment are discussed below.

C.     Introduction of the Doodle Pro

In 1997, Mattel merged with Tyco. Thereafter, Mattel's subsidiary, Fisher-Price, assumed the rights and obligations of the Agreement as amended. Soon after the merger, Fisher-Price complained to PCA about the price of the panels used in the Magna Doodle. As a result, in 2000 and 2002, PCA lowered the price of the panels it sold to Fisher-Price. Those price reductions did not satisfy Fisher-Price, and, in 2003 Fisher-Price informed PCA that, if it did not lower its prices again, Fisher-Price would terminate the Agreement. PCA did not lower its prices, and Fisher-Price did not place an order for panels before October 15, 2003. Accordingly, the Agreement terminated on December 31, 2003.

Under the terms of the Agreement, Fisher-Price was allowed to sell off its existing supply of Magna Doodle toys for 180 days beginning January 1, 2004, which it did. At the same time, however, Fisher-Price began to develop and market a replacement product, using panels

purchased from an alternative vendor.  The new product is called the Doodle Pro.[2]  The new product and its packaging is nearly identical to the last version of the Magna Doodle sold by Fisher-Price.  The most significant difference between the two products is their logos.  The Magna Doodle product, as sold by Fisher-Price bore the label "Magna Doodle" in stylized purple script.  The words "The Original" appeared in a red oval above the name, and below the name was the slogan, "The world's favorite way to doodle!"  Additionally, the Magna Doodle packaging had a red banner bearing the word "Classic" running along the bottom of the package's face.  The Doodle Pro product bears the label "Doodle Pro," also in stylized purple script, though not in the same font.  None of the other markings just described appear on the Doodle Pro package.

On May 5, 2004, PCA licensed its "Magna Doodle" trademark to The Ohio Art Company ("Ohio Art").  The prototype packages for the Ohio Art product bear the same logo as the last Fisher-Price Magna Doodle, including the words "The Original" and the slogan, "The world's favorite way to doodle!"  The Ohio Art package's other elements differ from Fisher-Price's.

## II.     Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (party must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

---

[2] The United States Patent and Trademark Office has approved the "Doodle Pro" mark for publication and likely registration.

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"), *cert. denied*, 506 U.S. 965 (1992). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991), *cert. denied*, 502 U.S. 849 (1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## III. Discussion

This is an unusual trademark and trade dress infringement case. For a number of years, PCA and Fisher-Price combined a strong trademark (PCA's "Magna Doodle" mark) with a strong toy and packaging design (created by Fisher-Price) to market a successful product. When the two companies parted ways, both continued to market an electronic writing toy – PCA continued to use the "Magna Doodle" name, and Fisher-Price continued to use the toy design and packaging it created. PCA now claims, in effect, that Fisher-Price's use of that trade dress constitutes trademark infringement and unfair competition under the Lanham Act (15 U.S.C. § 1125, *et seq*.), even though Fisher-Price created the trade dress and used it on its product, and no agreement ever transferred ownership of that trade dress to PCA. Having failed to submit any evidence that PCA owns the trade dress, PCA has also failed to show that a reasonable fact-finder could do anything but speculate about the source of any consumer confusion in the marketplace. There is no evidence to suggest that there is a likelihood of consumer confusion

created by similarities between the trademarked names of the products rather than by the continued use of the trade dress that Fisher-Price first used with the Magna Doodle.

      A.     Ownership of Trade Dress

Fisher-Price argues that, although PCA may have owned the older trade dress associated with Magna Doodle, PCA does not own the trade dress that Fisher-Price created and used to market the Magna Doodle between 1997 and 2004. PCA responds that it had a contractual agreement with Fisher-Price that gave PCA ownership of all of the trade dress associated with the Magna Doodle product that Fisher-Price created and used.

*1.*     *Creation and Use of the Disputed Trade Dress*

"Trade dress" consists of "the appearance of labels, wrappers and containers used in packaging" a particular product, as well as "the total look of the product," including "the design and shape of the product itself." J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:4 at 8-15 (4th ed. 2005) ("MCCARTHY"). The trade dress at issue in this case is depicted at pages 4 to 6 of Fisher-Price's Memorandum in Support of Summary Judgment. *See* doc. #123-1 at 4-6. Principally, the disputed trade dress consists of a particularized shape, specific features, and a certain packaging. *See id.*

It is undisputed that Fisher-Price created the trade dress at issue. Indeed, Fisher-Price initiated, financed, and developed extensive re-design efforts of the Magna Doodle toy with no creative input from PCA. Under copyright law, there is, in effect, a presumption of ownership of "original works of authorship" by the creator.[3] *See* MCCARTHY § 6:13 at 6-29; *cf.* 17 U.S.C. §

_____

[3] Copyright law and trademark law protect different types of property rights, and the principles relevant to each body of law are not necessarily interchangeable. *See* MCCARTHY §§ 6:1 and 6:2 at 6-2 to 6-4. Still, there are times when the doctrines may overlap. *See id.* § 6:5 at

201(a) (explaining that copyright ownership "vests initially in the author . . . of the work"). An "original work of authorship" may be "fixed in any tangible medium," and may include pictorial, graphic, and sculptural works. MCCARTHY § 6:13 at 6-29. Here, Fisher-Price applied for and received federal copyright registration for its designs that make up at least part of the trade dress at issue in this case; that registration is prima facie evidence that Fisher-Price created at least the part of the trade dress it copyrighted. 17 U.S.C. § 410(c). Fisher-Price registered copyrights on both the Magna Doodle product and on the packaging of the product. Thus, Fisher-Price presumptively owns the trade dress it created and copyrighted, and by receiving federal registration of its designs, Fisher-Price put PCA on notice of Fisher-Price's ownership interest in the trade dress.

Moreover, Fisher-Price used the disputed trade dress in connection with the Magna Doodle product that Fisher-Price produced and sold. Under trademark and trade dress principles, in order for a party to attain a protectible interest in trade dress, the elements making up the trade dress at issue "must have been *used* in such a manner as to denote product source." MCCARTHY § 8:1 at 8-4 (emphasis in original). "[T]rade dress protection exists only if it can be proven that the trade dress identifies and distinguishes [a particular party] as the source." *Id.* at 8-8.

Here, even if PCA could theoretically have an ownership interest in the trade dress created and copyrighted by Fisher-Price, it would have to prove that the trade dress was used in "such a manner as to denote" PCA as the source of the product. PCA has not offered any evidence that, based upon the use of the disputed trade dress, PCA has become identified as the source of the Magna Doodle toy. It is not surprising that PCA has not produced any such

6-7.

evidence because Fisher-Price was, in fact, the source of the Magna Doodle toy at all relevant times; it manufactured and distributed the toy during the years when the disputed trade dress was in use. The trade dress was used in connection with the "Magna Doodle" trademark, but that fact alone says nothing about whether the trade dress denotes PCA as the source of the product. Accordingly, PCA has failed to prove that the trade dress created and used by Fisher-Price was used in "such a manner as to denote" PCA as the source of the Magna Doodle toy.

### 2. *Whether Ownership Was Transferred by Agreement*

Still, ownership of trade dress can be transferred from one party to another, either before or after it is created. For example, one party can license its trademark to another by contract specifying that any trade dress the licensee develops becomes the property of the licensor. *See* McCarthy § 18:1 at 18-5 ("[M]arks, like any kind of property, can be bought, sold and licensed."); McCarthy § 8:1 at 8-5 (discussing application of trademark principles to trade dress disputes); *cf. Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.*, 466 F.3d 97, 100 (2d Cir. 2006) (discussing work for hire in copyright context). That did not happen here. Nevertheless, PCA argues that the Agreement and Amendment executed by the parties with respect to the licensing of the "Magna Doodle" mark transferred ownership to PCA of the trade dress later created by Fisher-Price. A close reading of the amended Agreement, however, reveals that no ownership interest in the trade dress was transferred to PCA. Thus, Fisher-Price retains ownership of the trade dress that it created and used.

### a. Legal Standard

It is undisputed that New York law governs the interpretation of the Agreement. Under

New York law, "the initial interpretation of a contract is a matter of law for the court to decide." *International Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996)); *In re Estate of Stravinsky*, 4 A.D.3d 75, 81 (2003) ("It is also well settled that the issue of whether an agreement is ambiguous is a question of law for the courts."). "The key inquiry at this initial interpretation stage is whether the contract is unambiguous with respect to the question disputed by the parties." *International Multifoods Corp.*, 309 F.3d at 83. Ambiguity is "determined by looking within the four corners of the document and not to outside sources." *In re Estate of Stravinsky*, 4 A.D.3d at 81. The court may not admit extrinsic evidence to create ambiguity. *Readco, Inc.*, 81 F.3d at 299.

The test for ambiguity is whether the contract terms are capable of "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated Agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Morgan Stanley Group, Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000). If the court determines that contract terms are not ambiguous, "it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence." *International Multifoods Corp.*, 309 F.3d at 83.

b.      Plain Language of the Agreement and Amendment

The contract between PCA and Fisher-Price is silent regarding which party would own the trade dress created and used by Fisher-Price. Neither the Agreement nor the Amendment

addresses that subject.[4]  Thus, neither the Agreement nor the Amendment transferred ownership

of the trade dress from Fisher-Price to PCA.

PCA cites section 3.1 of the Agreement as the source of its right to the trade dress created

and used by Fisher-Price.  Section 3.1 of the Agreement provides:

> TYCO acknowledges that PCA is the owner of all right, title and interest in
> and to the Mark; that TYCO has and will acquire no ownership rights in the
> Mark by reason of this Agreement or its distribution of the Product pursuant
> to this Agreement; and that *all use of the Mark by TYCO will inure to the
> benefit of PCA.*

(emphasis supplied).  The Agreement defined "Mark":

> "Mark" will mean the trademark MAGNA DOODLE, any trademark
> registrations and applications for trademark registrations with respect to that
> trademark presently owned or *hereafter acquired by PCA* anywhere in the
> Territory and any common law rights presently owned or hereafter acquired
> by PCA with respect to that trademark anywhere in the Territory.

(emphasis supplied).  The pertinent parts of the 1994 Amendment stated:

> WHEREAS, PCA and Tyco wish to amend the definition of the licensed
> "mark" to include those trademarks used by Tyco in connection with line
> extensions for the "MAGNA DOODLE" product on behalf of PCA  . . . .

> "Mark" will mean the trademarks "MAGNA DOODLE", "MAGGIE
> DOODLE", "MAGNA DOODLE DAN", "THE ART OF IMAGINATION"
> or any other trademarks which may subsequently be used by Tyco in
> connection with the marketing and sale of goods in the "MAGNA DOODLE"
> line pursuant to license from PCA . . . .

The language of the Agreement does not mention trade dress.  PCA principally relies

upon two phrases in the Agreement to argue that the Agreement transferred ownership to PCA of

---

[4] There is no dispute that PCA created and owned the trade dress it had historically used
prior to 1997, i.e., the blue rectangular box design.  That design is not at issue here.  The disputed
trade dress is what Fisher-Price created between 1997 and 2002 and is now using in connection
with the Doodle Pro.

the trade dress Fisher-Price created. First, Section 3.1 provides that "all uses of the Mark by TYCO will inure to the benefit of PCA." "Mark" means "the trademark MAGNA DOODLE." PCA argues that when Fisher-Price put PCA's mark on Fisher-Price's trade dress, PCA acquired Fisher-Price's trade dress because that use of the mark "inures to the benefit of PCA."

PCA's argument misconstrues the plain language of the Agreement. The contract language provides that "all uses of the mark," that is, the "trademark MAGNA DOODLE," inure to the benefit of PCA. In other words, what inures to PCA's benefit is the use of the "Magna Doodle" mark itself. For example, if Fisher-Price changed the appearance or color of the name "Magna Doodle," that would be a use of the mark that would inure to the benefit of PCA, not Fisher-Price, because it is a use of the mark itself. The contract language does not provide that, as a result of Fisher-Price using the mark on its products, PCA acquires the ownership rights to the product's trade dress. Under the contract language, PCA would acquire nothing more than whatever stylized version of their trademark may have been put on the toy. It would not acquire other aspects of the packaging on which the trademark is placed. Thus, Section 3.1 does not transfer ownership of the trade dress to PCA.

PCA also relies upon the definition of the term "mark" as including "any common law rights presently owned or hereafter acquired by PCA," to argue that it acquired the rights to the disputed trade dress. At best, PCA's argument begs the question: what registrations or common law rights did PCA own or later acquire with respect to the "Magna Doodle" mark? The definition of the mark that PCA owns does not, by itself, expand what PCA owns. Even the contract language regarding "common law rights" hereafter acquired does not effect an acquisition from Fisher-Price of trade dress not yet created. The question then becomes whether

PCA "acquired" ownership rights to the trade dress. Nothing in the contract language provides for such a transfer of ownership rights.

PCA's argument requires bootstrapping. PCA claims that, because the Agreement provided that PCA *could* acquire certain rights in connection with its mark, that it *did*, in fact, acquire the right to Fisher-Price's trade dress. *See* McCarthy § 8:4 at 8-16 ("To state that something is *capable* of trade dress protection is hardly the same as concluding that it . . . has become valid and legally protectable trade dress [for a particular party].") (emphasis in original). That argument misses the point that there was never any act or language that triggered acquisition by PCA of Fisher-Price's trade dress. PCA assumes, without pointing to any operative contract language, that it acquired the right to Fisher-Price's trade dress just because its mark was used on the trade dress. The contractual language does not, however, effect a legal transfer of the ownership interest in the trade dress from Fisher-Price to PCA.

In addition, Section 10.1 tends to suggest that PCA would not own the trade dress created by Fisher-Price. That section provides that "[a]ll advertising, packaging and promotional material prepared by or for [Fisher-Price] that uses the Mark in a manner not previously approved by PCA will be subject to the prior approval of PCA, which approval will not be unreasonably withheld or delayed." Section 10.1 distinguishes between the mark itself and the packaging associated with the mark. Although Section 10.1 addresses various issues associated with the trade dress, it does not include any language conferring ownership of the trade dress on PCA. Rather, the language suggests that Fisher-Price could use its own trade dress in conjunction with PCA's mark, as long as it obtained approval to use the mark in that manner. Approval of packaging is common; it is intended to give the trademark owner the ability to police and protect

-13-

its mark, so that the mark will not be used in a way that could tarnish it. *Cf. Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074, 1076 (2d Cir. 1990). Approval rights, however, are not the same as ownership rights.

PCA argues that the Amendment expands what PCA owns by referring to trademarks in the plural, rather than trademark in the singular. Fairly read, the Amendment simply defines the scope of the license and provides that, to the extent another PCA mark is used by Tyco, a fee is due PCA. Specifically, the Amendment's language provides that "[m]ark will mean . . . any other trademarks which may subsequently be used by Tyco in connection with the marketing and sale of goods in the 'MAGNA DOODLE' line . . . ." The preceding sentences shed light on the meaning of that language by defining mark to include "those trademarks used by Tyco in connection with line extensions for the 'MAGNA DOODLE' product on behalf of PCA . . .," meaning "MAGGIE DOODLE," "MAGNA DOODLE DAN," and "THE ART OF IMAGINATION." The Amendment does not expand what PCA owns, but rather expands the license to include other PCA marks used by Tyco, i.e., marks for line extensions on the Magna Doodle. _____

> c.  Customs, Practices, Usages and Terminology as Generally Understood in the Particular Trade or Business

PCA also argues that trade dress is rarely mentioned in licenses, and it is understood that rights in trade dress used in connection with a licensed mark will belong to the licensor of the mark. It is proper to consider trade customs and usage when determining whether terminology used in a contract is ambiguous. *See Morgan Stanley Group, Inc.*, 225 F.3d at 275.

PCA cites the Stanley Report at ¶¶ 3-4 for the proposition that, in the toy industry, even

though trade dress is not typically mentioned in licensing agreements, industry practice provides that the licensor nevertheless owns the trade dress used with the licensed mark. Stephen Stanley, PCA's toy licensing expert, prepared an expert report in August 2005, opining that the industry standard in 1992 was that the term trade dress was not customarily included in licensing agreements. Instead, the term "trade dress" was understood to be included in the licensing of "common law rights." Stanley's opinion is that "a grant of rights to manufacture, sell and distribute a pre-existing toy product under a toy product sales and distribution agreement is customarily accompanied by a bundle of intellectual property rights associated with such toy product." Those rights include "a common law trade dress license." Stanley based his opinion on the express language in the parties' Agreement defining "Mark" as the trademark "Magna Doodle" and any common law rights owned or later acquired by PCA with respect to that trademark.

Stanley's opinion is relevant to the extent that it addresses the designs that PCA actually owned prior to the designs Fisher-Price created (i.e., the blue rectangle design). The problem with Stanley's opinion is that it does not apply to designs that PCA did not own (i.e., the ones that Fisher-Price created and used). In effect, Stanley's opinion suggests that, by licensing the "Magna Doodle" mark, PCA implicitly licensed associated common law rights; not that PCA acquired any common law rights through the licensing agreement. By Stanley's own admission, his opinion is based on the express language of the Agreement, and the rights the Agreement addresses are the common law rights that PCA owned or later acquired. There is no dispute that PCA owned certain trade dress rights relating to the blue rectangle Magna Doodle design. That design is not at issue here. In his report, however, Stanley does not account for the fact that PCA

did not own or later acquire the designs that are at issue in this case. In short, Stanley does not opine that PCA acquired rights to trade dress used by Fisher-Price in connection with the Magna Doodle toy. Thus, Stanley's report does not really address what the industry standard would be with respect to any common law rights not owned by PCA at the time the Agreement was entered into – i.e., the trade dress created and used by Fisher-Price.

Having considered the plain language of all relevant contract terms in the Agreement, as amended, as well as customs and usage evidence, I find that the Agreement and the Amendment are not ambiguous. Moreover, I conclude that no reasonable fact-finder could find that PCA owned or later acquired the trade dress created and used by Fisher-Price in marketing the Magna-Doodle toy. It is therefore appropriate to grant summary judgment in favor of Fisher-Price on the trade dress claim. Fisher-Price has also sought summary judgment on PCA's unfair competition claim under the Lanham Act (Count II). That count alleges that Fisher-Price's "unauthorized use of trade dress" constitutes unfair competition. Complaint ¶ 67. Because that unfair competition claim is wholly derivative of the trade dress infringement claim, and Fisher-Price has prevailed on the trade dress infringement claim, it is also appropriate to grant summary judgment in favor of Fisher-Price on the federal unfair competition claim.

B.     Trademark Infringement

PCA also claims that Fisher-Price is infringing the "Magna Doodle" mark itself.

A two-part test guides courts in considering claims of trademark infringement: (1) whether the plaintiff's mark is entitled to protection, and (2) whether the defendant's use of the mark is likely to cause consumers confusion concerning the origin or sponsorship of the defendant's goods. *See Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).

Here, there is no dispute that PCA's "Magna Doodle" mark/logo is entitled to protection. The

issue, therefore, is whether Fisher-Price's use of the mark, "Doodle Pro," is likely to cause

consumer confusion. "The likelihood-of-confusion inquiry turns on whether numerous ordinary

prudent purchasers are likely to be misled or confused as to the source of the product in question

because of the entrance in the marketplace of defendant's mark." *Playtex Products, Inc. v.

Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004) (internal quotation marks and citations

omitted). Importantly, the issue is whether there is a likelihood of confusion based solely upon

the aspects of the product entitled to protection, in this case, the mark/logo itself, not the trade

dress. *Cf. Virgin Enterprises Ltd.*, 335 F.3d at 146.

When determining whether there is a likelihood of confusion, courts in the Second

Circuit are guided by the so-called *Polaroid* factors, a non-exhaustive list that includes: (1) the

strength of the mark, (2) the degree of similarity between the marks, (3/4) the proximity of the

products/bridging the gap, (5) actual confusion, (6) the defendant's good faith in adopting its

own mark, (7) the quality of defendant's product, and (8) the sophistication of the buyers.

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). The *Polaroid* factors

"are not always dispositive . . . and other factors may be added or initial factors abandoned."

*Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998) (citations omitted).

Here, it is necessary to add another factor – the unique history of the trade dress used in

connection with the Magna Doodle.

In addition to the *Polaroid* factors, the court should also consider the fact that the United

States Patent and Trademark Office has approved Fisher-Price's "Doodle Pro" mark for

publication and likely registration, which means that the Patent and Trademark Office has

determined that the use of the "Doodle Pro" mark is not likely to cause confusion. That approval is "a factor which, while not conclusive, is entitled to great weight." *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 569 (2d Cir. 1971).[5]

The "likelihood of confusion" standard and the accompanying *Polaroid* factors used to analyze claims of trademark infringement do not change on summary judgment. *Platex Products, Inc.*, 390 F.3d at 161. "The fact that on summary judgment the evidence must be construed in a light favorable to the non-moving party does not modify the standard itself, which requires a showing of a probability, or likelihood, of confusion." *Id.* at 161-62. "Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law." *Id.* at 162. District courts generally should not treat any one factor as dispositive; nor should the courts use a mechanical process by which the party with the greater number of factors in its favor prevails. *Id.* Instead, courts should focus on the ultimate inquiry of consumer confusion. *Id.*

### 1.    The Strength of the Mark

PCA asserts that the "Magna Doodle" mark is strong, supported generally by evidence of Magna Doodle sales since the 1990s.

"The strength, or distinctiveness, of a mark is its power to identify the source of a product." *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999) (citing *Streetwise Maps, Inc.*, 159 F.3d at 743). In analyzing this factor, courts should evaluate the mark's "inherent distinctiveness, descriptiveness, and secondary meaning." *Id.* In addition,

---

[5] In *Syntex*, 437 F.2d at 569, the United States Patent and Trademark Office did not approve the mark, and the court gave that determination great weight in holding that there was a likelihood of confusion between the two marks.

"Although the category in which the mark qualifies – generic, descriptive, suggestive, or arbitrary – is useful in determining its strength, it is not dispositive: the strength of a mark depends ultimately on its distinctiveness, or its origin-indicating quality, in the eyes of the purchasing public." *Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 491 (2d Cir. 1988) (internal quotations omitted). "Registration under the Lanham Act is also pertinent to a mark's strength. Registration allows a merely descriptive mark to become incontestable [despite] lack of secondary meaning." *Time, Inc.*, 173 F.3d at 118 (citing 15 U.S.C. §§ 1065, 1115(b); *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193 (1985)).

Here, the "Magna Doodle" mark is best characterized as suggestive. Although the term "doodle" is largely descriptive, it requires some imagination to get from "magna" to "magnetic," and overall, it requires some imagination to conjure the image of a magnetic drawing toy from the term "Magna Doodle." In addition, the mark is federally registered. With respect to secondary meaning, PCA cites evidence that the "Magna Doodle" ranks among the top-selling toys over the past 25 years. Craig Declaration, Tab 1, ¶ 28.

There can be little doubt that the "Magna Doodle" mark is a strong mark, and this factor therefore weighs in favor of PCA.

2.     *The Degree of Similarity Between the Marks*

In assessing the degree of similarity between two marks, courts should look to the overall impression created by the logos and the context in which they are found, and then consider the totality of factors that could cause confusion among prospective purchasers. *Gruner + Jahr USA Pub.*, 991 F.2d at 1078. Generic terms do not receive trademark protection. 15 U.S.C. § 1064.

In addition, the Second Circuit has held that courts should not consider "descriptive" terms when deciding the degree of similarity between marks, because descriptive terms are legally irrelevant. *American Cyanamid Corp. v. Connaught Lab., Inc.*, 800 F.2d 306, 308 (2d Cir. 1986). In *American Cyanamid* Co., the Second Circuit considered two marks, "HIBVAX" and "HIBIMUNE" that shared a common pre-fix, "HIB." There, the Court said that the term "HIB" was generic, and that the marks were, on the whole, descriptive. In another case, *American Home Products Corp. v. Johnson Chemical Co., Inc.*, 589 F.2d 103 (2d Cir. 1978), the Court considered two marks, "ROACH MOTEL" and "ROACH INN" and determined that the mark "ROACH MOTEL" was, on the whole, a suggestive mark, and that the mark "ROACH INN" was confusingly similar.

Certain words, although technically "descriptive," could acquire "secondary meaning" or distinctiveness based upon their widespread use. *Eaton Allen Corp. v. Paco Impressions Corp.*, 405 F. Supp. 530, 532-33 (S.D.N.Y. 1975) (reasoning that "the determination whether a trademark has been infringed involves a consideration of the marks in their totalities"). Still, the Supreme Court has held that, "the holder of a registered mark may rely on incontestability to enjoin infringement and that such an action may not be defended on the grounds that the mark is merely descriptive." *Park 'N Fly, Inc.*, 469 U.S. at 205. In other words, the defendant in a trademark infringement action may not use descriptiveness as a defense where the trademark has achieved incontestable status with the United States Patent and Trademark Office. *Id.*

Fisher-Price argues that I should consider only the words "Magna" and "Pro" in determining whether the two marks are similar, because the term "Doodle" is descriptive, rather than suggestive. Fisher-Price contends, relying upon *American Cyanamid Corp.*, 800 F.2d at

308, that the term "Doodle" is legally irrelevant.  PCA, on the other hand, argues that I must

consider the name in its entirety, in order to consider the overall impression of the marks.  It

argues that, even if the term "Doodle" is technically descriptive, it has acquired secondary

meaning based upon widespread use.   PCA also argues that its mark is incontestable, and

therefore, Fisher-Price cannot defend this action on the ground that the term "Doodle" is

descriptive.

Even considering the marks as a whole, there is a low degree of similarity between the

two.  The marks do not look or sound much alike.  The two marks are similar in that they both

contain two words, including the shared word "Doodle."  The placement of the word "Doodle"

differs in that it comes second in ""Magna Doodle"" but first in "Doodle Pro."  In addition, the

non-shared words in the marks, "Magna" and "Pro" are not similar.  Those facts differ from the

facts in *American Home Products Corp.*, 589 F.2d at 103, where the Court determined that the

two marks, "Roach Hotel" and "Roach Inn" were similar.  There, the placement of the shared

word, "Roach" was identical, and the non-shared words were synonyms.

I conclude that the degree of similarity between the marks is low; thus, this factor weighs

in favor of Fisher-Price.[6]

### 3/4.    The Proximity of the Products/Bridging the Gap

The third and fourth *Polaroid* factors measure whether the two products compete with

each other.  "To the extent goods (or trade names) serve the same purpose, fall within the same

---

[6] When there is "no similarity between the two marks that might generate confusion
between the products," there is no need to weigh each of the *Polaroid* factors.  *American
Cyanamid Corp.*, 800 F.2d at 309.  Because there is some similarity, however, I will address each
of the *Polaroid* factors.

general class, or are used together, the use of similar designations is more likely to cause confusion." *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993). Because "the products on which the marks are used are competitive . . . there is no gap to be bridged between them. To establish likelihood of confusion, competing goods require less proof under the *Polaroid* factors than noncompetitive items." *Banff, Ltd.*, 841 F.2d at 492.

Here, this factor weighs in favor of PCA, because the two products serve the same purpose, fall within the same class, and directly compete with each other.

        5.    *Actual Confusion*

Trademark infringement exists when there is "a probability of confusion, not a mere possibility." *Streetwise Maps, Inc.*, 159 F.3d at 743. "A probability of confusion may be found when a large number of purchasers likely will be confused as to the source of the goods in question." *Id.* The issue of confusion in this case relates only to the marks on the two products, not the trade dress, because the trade dress is not an actionable basis for infringement against Fisher-Price. Thus, evidence of actual confusion stemming from Fisher-Price's use of the former Magna Doodle trade dress on the Doodle Pro toy does PCA no good. In order to prevail on this factor, PCA must show that an appreciable number of people would be confused by the similarities of the trademarks in their entireties, as those marks are encountered in the context of their actual use. *See id.*

PCA has submitted three types of evidence that it argues shows actual confusion: (1) consumer confusion, that is, consumers who admit to a mistaken purchasing decision; (2) mis-labeling on Internet retail websites, as well as retail employees at major toy retailers who refer customers to Doodle Pro when customers ask for "Magna Doodle"; and (3) the Ostberg Survey.

*See* Plaintiff's Summary Judgment Appendix, Volume 4, Dize Declaration ¶ 21 (summarizing PCA's evidence of confusion).

           a.        Consumer Confusion

The evidence PCA cites regarding "consumer confusion" does not create a genuine issue of material fact regarding actual confusion. The principal problem with the evidence is that, generally, it does not address the central issue – namely, actual confusion with respect to the marks themselves. For example, in Exhibit O, a consumer claimed that a travel doodle product inscribed with an "Ohio Art" logo was packaged in a Fisher-Price box, and a consumer lodged a complaint as a result. PCA claims that the incident demonstrates actual consumer confusion. I disagree. That incident is not probative on the question of actual confusion. The consumer was not confused, but instead complained about the mixed packaging. The mis-packaging could have been the result of a mistake by a store employee or a deliberate act by another consumer intent on buying an expensive toy cheaply by swapping the packaging with a less expensive one. Moreover, even if it would be reasonable to infer that the product was mis-packaged based upon some sort of confusion about the product on the part of a retail sales employee, it would not be reasonable to infer that the source of confusion was the mark itself. This evidence would require a jury to speculate in order to reach the conclusion that the mis-packaging resulted from actual confusion and that the source of that confusion was similarities between the two marks.

The same problem plagues PCA's other evidence of consumer confusion. *See* Dize Declaration ¶ 21 at 3-4. The piece of evidence that most supports PCA's position is Exhibit R, Document ID No. 400147, which is a consumer confusion email in which a consumer "had no idea" that "Magna Doodle" and "Doodle Pro" were different brands. A reasonable fact-finder

could infer from that evidence that one consumer was actually confused about the two marks.[7]
Still, PCA must show that "a large number of consumers" will likely be confused about the
source of the goods based upon the trademarks/logos on the goods. The evidence put forward by
PCA does not satisfy the standard, even viewing it in the light most favorable to PCA.

b.      Retail Employee Confusion/Internet Sales Confusion

PCA argues that employees at major toy retailers and Internet toy retailers "routinely
confuse the parties' trademarks, which has led to commingling of the parties' marks and
erroneous sales." Memorandum of Law in Opposition to Defendants' Motion for Summary
Judgment at 32. In support of that contention, PCA claims to have "amassed considerable
admissible evidence" of the actual confusion between the parties' trademarks. I disagree.
Although there is evidence that retail employees have confused the Magna Doodle and Doodle
Pro products, there is no evidence that the confusion results from the parties' trademarks.
Drawing all reasonable inferences in favor of PCA, reasonable jurors could not infer that the
retail confusion between the products derives from confusion regarding the marks themselves;
rather, if a jury made such a finding, it would be based on mere speculation.

Specifically, PCA cites evidence in which "E-Bay sellers confuse Doodle Pro and 'Magna
Doodle,'" as well as evidence that "Doodle Pro products [were] listed under heading of 'Magna
Doodles.'"  See Dize Declaration ¶ 21 at 4 (Exhibits B and C). That evidence does not support a
reasonable inference that the confusion resulted from the parties' trademarks; rather, the
confusion could result from any number of factors, including the use of the term "Magna

_____

[7] That is hardly surprising since the trade dress of the Doodle Pro was previously used on
the Magna Doodle.

-24-

Doodle" in a generic sense, the trade dress of the products or the similarity of the products themselves. Similarly, the fact that "customer reviews use term 'Magna Doodle' in reviews of Doodle Pro toys," *see* Exhibit J, does not create an inference that retailers confused the two trademarks. The other exhibits PCA cites to demonstrate Internet retailer and customer confusion suffer the same fault. *See id.*

In addition, the evidence submitted regarding retailer misdirection, *see* Dize Declaration ¶ 21 at 6-8, is equally unavailing. For example, an on-site Doodle Pro demonstrator at Toys 'R' Us repeatedly referred to the product as a Magna Doodle, and when questioned about the reference, the demonstrator said that they were the same product. That piece of evidence sheds no light on the question of retailer confusion regarding the parties' trademarks because there is no mention of the marks themselves. The demonstrator did not, for example, apologize for confusing the products and indicate that he often confused the names. He did not make any reference to the similarity of the product names. On the contrary, he indicated that the products were the same. Indeed, the products are the same, in the sense that they are both magnetic writing toys that accomplish the same function. The fact that the demonstrator said the products are the same does not mean that he thinks that the names are the same or that the products are distributed by the same company. The other evidence of "retailer confusion" similarly does not bear on the issue of confusion between the actual marks.

PCA is improperly conflating the issue of trade dress with the issue of confusion between the marks. A reasonable juror could not find in favor of PCA on the issue of actual confusion between the trademarks because PCA has not submitted any colorable evidence on the issue of actual confusion based upon the marks themselves.

c.       Ostberg Survey

PCA also cites the Osterberg Survey as evidence of actual confusion.  The parties discussed that survey at length during the preliminary injunction stage.  PCA does not add anything new to that discussion, but simply emphasizes that the survey is relevant because it tested only for confusion between the actual marks.

PCA's expert, Dr. Henry D. Ostberg, conducted a survey to determine the likelihood of confusion between the "Magna Doodle" and "Doodle Pro" logos.  He surveyed 232 people who were potential purchasers of a toy for writing and drawing on an erasable board.  Those survey respondents were first shown a series of five toy logos, accompanied by a brief description of what kind of toy the logo would mark.  The five logos, with their toy descriptions, were:

| Logo | Toy Description |
|------|-----------------|
| Hot Wheels | authentic-looking toy cars |
| Mega Bloks | building blocks |
| Fab Friends | character doll with a flair for fashion |
| Boggle Jr. | spelling and reading game |
| "Magna Doodle" | erasable writing/drawing toy |

The "Magna Doodle" logo shown to the respondents consisted of the purple stylized writing on a yellow background.  The logo appeared alone on a sheet of paper, not on a package, and without the words "The Original" or the slogan "The world's favorite way to doodle!"

The respondents were then asked a series of "buffer" questions, after which they were shown another series of five logos and descriptions.  The series contained:

| Logo | Toy Description |
|------|-----------------|
| Street Rockets | authentic-looking toy cars |
| Lego | building blocks |
| Fab Friends | character doll with a flair for fashion |
| Boggle Jr. | spelling and reading game |
| Doodle Pro | erasable writing/drawing toy |

The kinds of toys shown in this series were the same as in the first, i.e., they had the same descriptions.  Two of the toys were actually the same (Fab Friends and Boggle Jr.).

After showing a respondent the second series, the interviewer would then point to the Doodle Pro logo and ask "Was this – with the same brand name – included in the first portfolio you saw before?"  Respondents who answered "no" were then asked "Do you think that the company that puts out this product (i.e., Doodle Pro) also puts out or makes any of the products which were included in the first portfolio?"  If respondents answered "yes," they were asked to say which product and why.  Finally, respondents were asked "Do you think that this product received – or needed to receive – permission or approval from anyone for it to be made or sold?"  If respondents answered "yes," they were asked from whom was permission needed and why they believed permission was needed.

Respondents were then asked the same set of questions but about the "Street Rockets" toys.  This question was meant to work as an "internal control" – a means of determining what percentage of people may have been biased by the way that, or even just that fact that, questions were asked.

After bias was accounted for,[8] 22% of respondents believed "Doodle Pro" and "Magna Doodle" were the same brand. An additional 9% thought that Doodle Pro was either made by the same company or had received permission or approval from the same company that made Magna Doodle.

The Ostberg Survey presents several problems. First, the Ostberg Survey did not use the entire trademarked logo for the Magna Doodle. Dr. Ostberg left out two potentially distinguishing markers – the words "The Original" and the "Magna Doodle" slogan – even though those items have consistently been present on the actual "Magna Doodle" products. Thus, the survey did not compare the full, trademarked logos of the parties as they are used in the marketplace. Second, consumers were never shown any products. Instead, the survey was designed to determine whether the two logos were, in the abstract, confusingly similar. That two logos may be confusing when viewed in isolation, does not show that their use on two separate products is also confusing. Third, the survey's "internal control" was not ideal. It does not account for the possibility that respondents could have relied on non-protected similarities such as similar colors. Both the "Doodle Pro" and "Magna Doodle" logos shown to respondents consisted of purple writing on a yellow background. No other logos used in the survey contained this color scheme, and no two other corresponding logos had the same color scheme as each other (unless it was simply the same logo shown twice).

In sum, the most that reasonable fact-finders could glean from the Ostberg Survey is that consumers are more likely to confuse the name "Doodle Pro" written in purple on a yellow

---

[8] Bias was accounted for by subtracting the percentage of affirmative answers to the "Street Rockets" questions from the percentage of affirmative answers to the "Magna Doodle" questions.

background with the name "Magna Doodle" similarly written than they are to confuse the name "Doodle Pro" so written with the names of other toys – or than they are to confuse the name "Street Rockets," written in yellow, black, and white on a blue background, with the name "Hot Wheels" written in yellow and white on a red background. The Ostberg Survey, however, is not evidence that consumers are any more likely to confuse a Doodle Pro product with either the "Magna Doodle" name or a Magna Doodle product, than they are to confuse a Doodle Pro product with any other drawing toy, or any other drawing toy with a Magna Doodle.

Therefore, although PCA has submitted evidence that it claims demonstrates actual confusion, that evidence is largely irrelevant because it says nothing about confusion between the trademarks themselves. A jury would be left to speculate about the meaning of the evidence, which is not permitted. Because reasonable fact-finders could not infer from the evidence presented that an appreciable number of individuals would actually be confused by the parties' trademarks, this factor weighs in favor of Fisher-Price.

### 6.    *Fisher-Price's Good Faith in Adopting the Mark*

The test for good faith is "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995) (quotations omitted). Good faith might be demonstrated if the defendant selected a mark that "reflects the product's characteristics." *Id.* "Prior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Id.* (citation omitted). "Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion." *Beer Nuts, Inc. v. Clover Club Foods*

*Co.*, 805 F.2d 920, 927 (10th Cir. 1986) (citations omitted). "The inference of intent is especially strong when the parties have had a prior relationship. Such a relationship provides evidence of the alleged infringer's intent to trade on the plaintiff's goodwill." *Id.*

PCA claims that soon after Fisher-Price began using the "Magna Doodle" trademark, it crafted a plan to appropriate the mark's goodwill. PCA cites the Patrick Declaration, Exhibit C for the proposition that, while still working with PCA, Fisher-Price questioned how close it could come to using the "Magna Doodle" name without infringing PCA's trademark. PCA also cites evidence that Fisher-Price wanted to capitalize on the consumer appeal and communication of the "Magna Doodle" name when creating the Doodle Pro name. *See* Patrick Declaration, Exhibit B. PCA also cites evidence of the success of the Magna Doodle, arguing that Fisher-Price was trying to capitalize upon the goodwill associated with the name.

Given the parties' prior relationship and the evidence submitted, I conclude that this factor weighs in favor of PCA.

### 7. *Quality of Fisher-Price's Product*

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener Co., Inc.*, 59 F.3d at 398 (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986)). Although PCA argues that Fisher-Price's product, the Doodle Pro, is inferior, there is no record evidence to support that contention. Although the panel used in the Doodle Pro is cheaper, that does not make the product inferior. Thus, this factor weighs in favor of Fisher-Price.

8.    *Sophistication of Buyers*

"When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care."  *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329 (Fed. Cir. 2000).  There is no dispute that the goods here are relatively low-priced, in the range of $7.99 to $14.99, and thus the "sophistication of buyers" factor weighs in PCA's favor.

9.    *Additional Factor:  History of Trade Dress*

This is an unusual case because of the history of the trade dress used in connection with the Magna Doodle.  Although a past history of joint efforts by the parties is not one of the traditional *Polaroid* factors, it is appropriate to consider it in this case.  *See Streetwise Maps, Inc.*, 159 F.3d at 743.  Fisher-Price created and owns the trade dress that was once used to market the Magna Doodle, but is now used to market the Doodle Pro.  As discussed in the first part of this ruling, PCA does not own that trade dress, and therefore, cannot make a claim for infringement based upon Fisher-Price's continued use of that trade dress.  Thus, there is no trademark violation, even if consumers are actually confused about the source of these competing products, so long as that confusion stems from the continuity of the trade dress owned by Fisher-Price, which was used first on the Magna Doodle and now on the Doodle Pro.  If consumers are confused because the Doodle Pro packaging looks like the "old" Magna Doodle packaging or because the Doodle Pro looks like the "old" Magna Doodle, that confusion will not sustain a trademark claim by PCA.

Rather, PCA must offer evidence that there is a likelihood of confusion with respect to what it owns, i.e., the trademark "Magna Doodle."  In other words, PCA must show that there is

a likelihood of confusion with respect to the two names in issue; as discussed previously, it has not done so.  Although it may be difficult to separate out the mark (what PCA owns) from the dress (what Fisher-Price owns), PCA must do so in order to demonstrate a likelihood of confusion regarding the mark.  Because it has failed to do so, reasonable fact-finders would be left to speculate whether the evidence of confusion relates to the mark or the dress.  Thus, this significant factor weighs strongly in favor of Fisher-Price, and suggests that summary judgment is appropriate.

          *10.*     *Summary*

On balance, the *Polaroid* factors most important to the determination of this case, as well as the added factor regarding the history of trade dress, weigh in favor of Fisher-Price.  In addition, I give "great weight" to the United States Trademark Office's approval of Fisher-Price's "Doodle Pro" mark for publication and likely registration.  *See Syntex Laboratories, Inc.*, 437 F.2d at 569.  PCA has failed to present any evidence that it owns the trade dress that Fisher-Price is now using in connection with its Doodle Pro products.  Its infringement claim, therefore, is limited to the question whether there is a likelihood of confusion created by Fisher-Price's adoption of the "Doodle Pro" mark.  PCA has failed to submit any evidence from which reasonable fact-finders could do anything but speculate about that question.  Therefore,  I conclude that PCA has not presented evidence from which a jury could find a likelihood of confusion between the parties' trademarks.

**IV. Conclusion**

Fisher-Price's motion for summary judgment (**doc. # 123**) with respect to the claims for trademark and trade dress infringement (Count I), and the federal unfair competition claim (Count II) is **GRANTED**. Fisher-Price also sought summary judgment on PCA's common law unfair competition claim (Count IV), as well as partial summary judgment on its Connecticut Unfair Practices Act claim (Count III) and breach of contract claim (Count V). My ruling does not directly address those state-law claims. Rather, those claims, as well as the remaining pendent state-law claims delineated in the complaint, are dismissed without prejudice to refiling in state court within 30 days from the date of this order. *See* 28 U.S.C. § 1367; WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D § 3567.1 at 133 (2d ed. 1984); *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966). The clerk shall close this case.

It is so ordered.

Dated at Bridgeport, Connecticut, this 24th day of July 2007.


/s/ Stefan R. Underhill

Stefan R. Underhill
United States District Judge